## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

|  |  |
|---|---|
| RYAN AVENARIUS and RODNEY E. JAEGER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> EATON CORPORATION; DAIMLER TRUCKS NORTH AMERICA LLC; FREIGHTLINER LLC; NAVISTAR INTERNATIONAL CORP.; INTERNATIONAL TRUCK AND ENGINE CORP.; PACCAR INC.; KENWORTH TRUCK CO.; PETERBILT MOTORS CO.; VOLVO TRUCKS NORTH AMERICA; and MACK TRUCKS, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) Case No.: <u>10-CV-2539 EFM/JPO</u> ) ) ) ) ) ) ) ) ) ) ) ) |

## COMPLAINT—CLASS ACTION

Plaintiffs, Ryan Avenarius and Rodney E. Jaeger, bring this action, by and through their undersigned counsel, on behalf of themselves and on behalf of a Class of "indirect purchasers" that purchased, in the United States, Class 8 Truck Transmissions (described below) indirectly from Defendants, and would show the Court as follows:

## NATURE OF CLAIM

1. This case arises out of a conspiracy wherein Original Equipment Manufacturer ("OEM") "Defendants," Daimler Trucks North America LLC ("Daimler Trucks"); Freightliner LLC ("Freightliner"); Navistar International Corp. ("Navistar"); International Truck and Engine Corp. ("International"); PACCAR Inc. ("PACCAR"); Kenworth Truck Co. ("Kenworth"); Peterbilt Motors Co. ("Peterbilt"); Volvo Trucks North America ("Volvo"); and Mack Trucks, Inc. ("Mack") (collectively the "OEM Defendants") conspired

with defendant Eaton Corp. ("Eaton") to maintain and enhance the monopoly power of Eaton in the Class 8 Truck Transmissions Market during the period from October 1, 2002 to the present (the "Class Period").

2.      Defendants accomplished this goal through the implementation of a series of exclusive dealing arrangements among and between Eaton and the OEM Defendants.  The exclusive dealing agreements were put in place by Defendants in order to foreclose the Class 8 Truck Transmissions Market from Eaton's competitors, including Eaton's most serious competitor, ZF Meritor.  As set forth more fully below, Defendants' illegal, anticompetitive conspiracy was highly successful in eliminating competition in the market for Class 8 Truck Transmissions, thereby allowing Eaton to maintain and enhance its monopoly power.

3.      Defendants' conspiracy effectively eliminated any meaningful competition in the United States market for Class 8 Truck Transmissions.  Indeed, market foreclosure was the intended result of Defendants' conspiracy.  Eaton's Manager of OEM Sales and Marketing, has acknowledged the primary purpose of the exclusive dealing conspiracy was to harm the transmission business of Eaton's primary competitor, ZF Meritor.  In addition, the OEMs themselves acknowledged the success of the conspiracy.  For instance, Greg Sharp, a purchasing agent for defendant Freightliner LLC, acknowledged the success of the conspiracy, writing, in June 2002, that "[w]e have already killed Meritor's transmission business.  It is just a matter of time now before they close the doors."

4.      As a result of the conspiracy between Eaton and the OEMs, Plaintiffs and the other members of the Class were injured in their business and property by paying more for Class 8 Truck Transmissions than they otherwise would have paid in the absence of

Defendants' unlawful, exclusionary conduct.

5.      On October 30, 2009, a jury determined that Eaton's exclusivity agreements with the OEMs constituted a contract, combination, or conspiracy that unreasonably restrained trade, *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation,* Civil Action No. 06-623-SLR (D. Del.).

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA"), under 28 U.S.C. § 1332(d)(2), because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interest and costs, and this matter is a class action in which some Class members are citizens of a state different than those states of which Defendants are citizens.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the misconduct alleged herein took place, in part, in this District and/or had effects in this District.

8.      This Court has personal jurisdiction over Defendants because Defendants received substantial compensation and profits from the indirect sales of Class 8 Truck Transmissions in this District.  Thus, Defendants' liability arose, in part, in this District.

## THE PARTIES

### Plaintiffs

9.      Plaintiff, Ryan Avenarius ("Iowa Plaintiff"), is an individual and resident of the State of Iowa.  Mr. Avenarius indirectly purchased Class 8 Truck Transmissions from one or more of Defendants' authorized sales agents/dealers, in the State of Iowa, during the Class Period.

10.     Plaintiff, Rodney E. Jaeger ("Wisconsin Plaintiff"), is an individual and resident of the State of Iowa.  Mr. Jaeger purchased Class 8 Truck Transmissions from one or more of Defendants' authorized sales agents/dealers, in the State of Wisconsin, during the Class Period.

**Defendants**

11.     Defendant Eaton is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Troy, Michigan.  During all relevant times, Eaton manufactured Class 8 Truck Transmissions in the United States and marketed and indirectly sold Class 8 Truck Transmissions in the United States. Eaton can be served by serving its registered agent The Corporation Company, Inc., 112 SW 7th Street, Ste. 3C, Topeka, KS 66603.

12.     Defendant Daimler Trucks North America LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Portland, Oregon.  During all relevant times, Daimler Trucks manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, under the Freightliner, Sterling Trucks, and Western Star Trucks brands, in the United States.  Daimler Trucks can be served by serving its registered agent The Corporation Company, Inc., 112 SW 7th Street, Ste. 3C, Topeka, KS 66603.

13.     Defendant Navistar International Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Warrenville, Illinois.  During all relevant times, Navistar manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, under the brand of its subsidiary, International Truck and Engine

4

Corporation, in the United States.  Navistar can be served by serving its registered agent The Corporation Company, Inc., 112 SW 7th Street, Ste. 3C, Topeka, KS 66603.

14.     Defendant International Truck and Engine Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Warrenville, Illinois.  During all relevant times, International manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, in the United States.  International (now Navistar) can be served by serving its registered agent The Corporation Company, Inc., 112 SW 7th Street, Ste. 3C, Topeka, KS 66603.

15.     Defendant PACCAR, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Bellevue, Washington. During all relevant times, PACCAR manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, under the Kenworth and Peterbilt brands, in the United States. PACCAR can be served by serving its registered agent The Prentice-Hall Corporation System, Kansas, Inc., 200 SW 30th Street, Topeka, KS 66611.

16.     Defendant Kenworth Truck Company is a subsidiary of PACCAR, organized and existing under the laws of the State of Ohio, with its principal place of business in Kirkland, Washington.  During all relevant times, Kenworth manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, in the United States. Kenworth can be served by serving its registered agent, PACCAR, Inc. 777 106th Avenue NE, Bellevue, Washington 98004.

17.     Defendant Peterbilt Motors Company is an assumed name for PACCAR, with

5

its principal place of business in Denton, Texas.  During all relevant times, Peterbilt manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, in the United States.  Peterbilt can be served by serving its registered agent The Prentice-Hall Corporation System, Kansas, Inc., 200 SW 30th Street, Topeka, KS 66611.

18.     Defendant Volvo Trucks North America, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Greensboro, North Carolina.  During all relevant times, Volvo Trucks manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, under the Volvo and Mack brands (collectively, "Volvo/Mack"), in the United States.  Volvo can be served by serving its registered agent The Corporation Company, Inc., 515 South Kansas Ave., Topeka, KS 66603.

19.     Defendant Mack Trucks, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in Greensboro, North Carolina.  During all relevant times, Mack manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, in the United States.  Mack Trucks can be served by serving its registered agent The Corporation Company, Inc., 112 SW 7th Street, Ste. 3C, Topeka, KS 66603.

## CLASS ACTION ALLEGATIONS

20.     Plaintiffs bring this action pursuant to Rule 23(a) and (b)(1) and (3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following Class:

> All persons or entities that indirectly purchased, in the United States, Eaton Class 8 Truck Transmissions from Defendants (the "Class") beginning October 1, 2002 and continuing until the present (the "Class Period").

6

Excluded from this Class are: (1) Defendants and their parent companies, subsidiaries, affiliates, officers, directors, employees, legal representatives, heirs, assigns, and co-conspirators; (2) Any judges presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

21.   Fed. R. Civ. P. 23(a)(1)—Numerosity.  Plaintiffs do not know the exact number of members in the Class because such information is in Defendants' (or their sales agents/dealers) exclusive control.  Plaintiffs believe, however, that due to the nature of the trade and commerce involved, there are (at least) thousands of members in the Class such that joinder of all members in the Class is impracticable.  Furthermore, the members of the Class are readily identifiable from information and records in the possession of Defendants or their authorized sales agents/dealers.

22.   Fed. R. Civ. P. 23(a)(3)—Typicality.  Plaintiffs' claims are typical of the claims of the other members of the Class.  Plaintiffs and all members of the Class purchased Class 8 Truck Transmissions in the United States at inflated prices resulting from Defendants' conduct. Defendants' wrongful conduct damaged Plaintiffs and all members of the Class, *i.e.*, they paid increased prices for Class 8 Truck Transmissions when they indirectly purchased the Class 8 Truck Transmissions from one or more of Defendants' authorized sales agents/dealers.  All members of the Class were damaged by the same wrongful conduct by Defendants, and the relief sought is common to all members of the Class.

23.   Fed. R. Civ. P. 23(a)(2) and 23(b)(3)—Commonality and Predominance.  Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual members of the Class because Defendants have acted

upon grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Among those common questions of law or fact are:

(a)    whether Defendants engaged in a contract, combination, or conspiracy to restrain trade in, exclude competition in, or monopolize the United States market for Class 8 Truck Transmissions;

(b)    whether Defendants conspired to unreasonably restrain trade and maintain prices for Class 8 Truck Transmissions sold in the United States at supra-competitive levels by foreclosing the market for Class 8 Truck Transmissions in the United States;

(c)    the existence and duration of the illegal conduct alleged herein;

(d)    whether Defendants concealed their unlawful activities;

(e)    whether Defendants' anticompetitive conduct resulted in diminished competition for Class 8 Truck Transmissions in the United States;

(f)    whether Defendants' anticompetitive conduct caused prices for Class 8 Truck Transmissions to be higher than they would have been in the absence of Defendants' conduct;

(g)    whether Plaintiffs and the other members of the Class were injured by Defendants' conduct alleged herein and, if so, the appropriate class-wide measure of damages; and

(h)    whether Defendants unjustly enriched themselves at the expense of the members of the Class.

These common questions of law or fact predominate over any questions affecting only

individual members.   Plaintiffs know of no class members interested in individually controlling the prosecution of separate actions.   Plaintiffs know of no litigation concerning this controversy already begun.   This Court is as desirable as any other federal court for the concentration of this litigation.   The instant case will be eminently manageable as a class action.   Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

24.     Fed. R. Civ. P. 23(a)(4)—Adequacy.   Plaintiffs will fairly and adequately protect the interests of the other members of the Class because they have no interests that are antagonistic to, or that conflict with, those of any other member of the Class.   Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent Plaintiffs and the Class.

25.     Fed. R. Civ. P. 23(b)(1).   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

26.     Fed. R. Civ. P. 23(b)(3)—Superiority.   This class action is the superior method for the fair and efficient adjudication of this controversy.   Class treatment will permit a large number of similarly situated persons or entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.   The damages sustained by individual members of the Class, although meaningful, do not rise to the level where it is economically rational to prosecute separate complex actions against these well-financed corporate Defendants.

## FACTS

### BACKGROUND

#### Truck Transmissions

27.     A transmission or gearbox sends power from a vehicle's engine to its drive wheels.  When equipped with the proper transmission, the engine produces sufficient torque (*i.e.*, the force used to turn the engine crankshaft) to accelerate and maintain a vehicle's speed. Torque is measured in foot-pounds ("ft-lbs"), and a transmission's capacity to accommodate torque is referred to as its "torque rating."

28.     The switching of gears may be performed manually (by the driver) or automatically, depending on the type of transmission.  To change gears using a conventional stick-shift manual transmission, the driver typically must depress the clutch pedal and move a shift lever to the desired gear.  In a vehicle with a conventional automatic transmission, the driver of the vehicle does not have to change gears; the transmission uses hydraulics to select the gears automatically.  A vehicle with a conventional manual transmission has three pedals (accelerator, brake, and clutch) while a vehicle with a conventional automatic transmission has two pedals (accelerator and brake).

29.     "Automated manuals" are manual transmissions with clutches that have been automated with actuators and electronic controls to perform operations normally performed by the driver's feet.  A fully automated manual transmission has two pedals (accelerator and brake) and an electronically controlled clutch.  The driver can drive in either automated or manual mode.  In manual mode, the driver uses a stick-shift to initiate shifts between gears, and an on-board computer operates the pedal-less clutch or controls the engine to allow for pedal-less gear-shifting.

10

### Class 8 Heavy Duty Trucks

30.     There are eight recognized classes of vehicles which employ different transmissions.  Class 8 trucks, also known as heavy duty trucks, are the heaviest, weighing over 33,000 pounds.  Unlike Class 8 Truck Transmissions, the transmissions used in Class 1 through Class 7 vehicles are not built to withstand the high torque generated by the diesel engines that power heavy duty trucks, and are therefore not reasonably substitutable with them.

31.     Examples of Class 8 trucks include tractor trailers, large moving and long-haul delivery vehicles, and heavy construction vehicles such as dump trucks and cement trucks.

32.     In the Class 8 truck manufacturing industry, OEMs purchase Class 8 transmissions from suppliers (Eaton, ZF Meritor, etc.) and then provide them as alternative options to Class 8 truck purchasers, much like an automobile purchaser chooses among options when buying a new car.  In buying Class 8 trucks, the buyer chooses among various components/options from the OEM's "databooks."  As with purchasing a car, certain components are "standard" in the databooks, while others are considered upgrades, usually offered at an increased price.

### Class 8 Truck Transmissions Market

33.     Since the late-1950s, Eaton has dominated the market for Class 8 Truck Transmissions in North America.  In 1989, however, Meritor Transmission Corporation ("MERITOR") began selling Class 8 Truck Transmissions in competition with Eaton.  By 1999, MERITOR built its market share to over 16 percent.

34.     In 1999, to further improve its competitive position, MERITOR entered into a joint venture with ZF Friedrichshafen AG, a European manufacturer of heavy duty

transmissions.  The joint venture, named ZF Meritor, used its collective expertise to develop and market the industry's first fully automated, two-pedal (accelerator and brake only, no clutch pedal) manual Class 8 Truck Transmission.  The successful launch of this revolutionary transmission increased ZF Meritor's sales volume and positioned it to expand its transmission offerings to serve a wider variety of heavy duty truck applications.  Eaton was cognizant of ZF Meritor's growing penetration into the Class 8 Truck Transmissions Market, as evidenced by a PowerPoint presentation created in approximately 2000, wherein Eaton noted that its dominant market "Position is at Risk" and that ZF Meritor was viewed as a "Serious Competitor" and a "real threat."

35.    In 2000, the market for Class 8 trucks experienced a substantial downturn, causing a significant reduction in sales volume among the OEMs and other market participants, including Eaton and ZF Meritor.  For example, from 2000 to 2002, Eaton lost almost two-thirds of its market volume for heavy duty transmissions.  It is axiomatic that in a competitive market, under these circumstances, Eaton would have made an effort to increase its market share by reducing prices on its existing products or work to develop superior Class 8 transmissions.  Similarly, OEMs would have taken advantage of the downturn by forcing Eaton and ZF Meritor into a pricing war for the OEMs' business.

36.    Instead of responding in a competitive manor, however, Eaton and the OEMs hatched a plan to eliminate competition in the market for Class 8 Truck Transmissions.  The OEMs, each of whom held substantial bargaining power over Eaton, at least while ZF Meritor remained a meaningful competitor, were the driving force behind the conspiracy. Indeed, according to at least two sales managers at Eaton, the OEMs approached Eaton concerning the anticompetitive, exclusive dealing arrangement.

37.    In fiscal year 2005, over 325,000 new Class 8 Truck Transmissions were sold, and revenues from these sales exceeded $1 billion.

38.    Class 8 Truck Transmissions can be subdivided into three product categories: linehaul, vocational, and specialty.  Purchasers of Class 8 Truck Transmissions intend to use them for a particular vehicle (*i.e.*, linehaul, vocational, or specialty) and cannot substitute a transmission intended for a different vehicle type.

39.    Approximately 70 percent of Class 8 Truck Transmissions are used in linehaul trucks ("Linehaul Transmissions").  Linehaul trucks are designed to carry freight long distances, travel 60,000 miles or more a year, and operate mostly on highways or other paved surfaces.  Linehaul trucks are used to haul, among others, box trailers, curtain siders, refrigerated trailers, tankers, flat beds, and car-carrying trailers.

40.    About 26 percent of Class 8 Truck Transmissions are used in vocational trucks. Class 8 Transmissions used for vocational applications ("Vocational Transmissions") are found in heavy duty trucks operating in rugged performance environments.  Vocational transmissions are predominately found in heavy duty construction vehicles, which need great versatility to operate in on-road and off-road environments.

41.    The remainder of Class 8 Truck Transmissions, about 4 percent, are sold for specialty trucks.  Class 8 Truck Transmissions used for specialty applications ("Specialty Transmissions") are primarily used in "stop and start" vehicles, such as garbage, fire, and short-haul delivery trucks.

42.    As noted above, the Class 8 truck OEMs purchase Class 8 Truck Transmissions and incorporate those transmissions into the trucks they indirectly sell to

truck buyers, such as Plaintiffs, through authorized sales agents/dealers.

43.     When selecting components for a new truck purchase, truck buyers refer to OEM product databooks which list an OEM's component offerings, including transmissions. For each component, one brand will be listed as "standard," while others may be listed as optional.  Optional transmissions are usually priced at a mark-up above the price of the standard transmission.

44.     When a transmission is excluded from the OEM's databooks and not listed as an option, the transmission manufacturer's ability to sell the transmission is severely diminished, if not completely eliminated.  When not listed as an option, an unlisted transmission, if available at all, is always priced at a substantially higher cost.

45.     In addition to competing for databook positioning to increase demand for its transmissions, a transmission manufacturer may try to generate downstream sales by enticing the truck buyer to order a particular transmission from an OEM, with monetary incentives such as discounts or competitive equalization payments (*i.e.*, payments to customers to meet a competitor's price or "equalize" the price), as well as non-monetary incentives such as demonstrations of product superiority and value.  When a manufacturer's transmission is excluded from the OEM databooks, however, this type of marketing becomes considerably more costly and far less effective.

46.     There are substantial barriers to entry into the Class 8 Truck Transmissions Market.  A new entrant into the market faces high sunk and fixed costs to bring competitive products to market.  They have little-to-no ability to license the intellectual property needed for transmission design and development, and have to spend substantial amounts of money to validate the reliability and other attributes of their products, which can take upwards of a

year or more.  They would also have to make intensive and sustained investments in transmission marketing, warranty programs, demonstrations, sales, and service if they hope to persuade customers to purchase or switch to their transmissions.  Finally, entrants would need sustained sales of transmissions in order to earn enough market share to be able to recoup these substantial entry costs.

## EATON'S MONOPOLY POSITION FOR CLASS 8 TRUCK TRANSMISSIONS

47.     Beginning with its purchase of the Fuller Manufacturing Company in 1958, Eaton has been the dominant and most widely known heavy duty manual transmission manufacturer in the United States and, indeed, all of North America.

48.     By the late-1980s, Eaton held at least an 80 percent market share and the standard position in the databooks for nearly every truck model at each of the OEMs in the submarkets for Class 8 Linehaul and Vocational Truck Transmissions.

49.     Based on sales of all Class 8 Truck Transmissions (linehaul, vocational, and specialty combined), Eaton has at least 90 percent of the market.  The other Class 8 Truck Transmissions manufacturers in the United States market are Allison Transmission (a division of General Motors) and Volvo/Mack, which produces transmissions only for its own line of trucks.

50.     Eaton has had monopoly power in the Class 8 Truck Transmissions Market throughout the Class Period, and its current market share is upwards of 90 percent.  Eaton has described itself as "solidly entrenched" in the marketplace.

## THE CONSOLIDATION OF THE HEAVY DUTY TRUCK MARKET

51.     In 1996, there existed seven OEMs which manufactured heavy duty trucks. The OEMs included Freightliner, PACCAR, International (via Navistar), Volvo, Mack,

Sterling, and Western Star.

52.     Over the next six years, following a series of acquisitions, that number was reduced to four, with only Freightliner, PACCAR, International, and Volvo/Mack surviving consolidation.

53.     The four remaining OEMs each have substantial market share.  According to testimony provided in open court, their market share was nearly evenly divided, with Freightliner and PACCAR possessing slightly larger shares and International and Volvo/Mack possessing slightly smaller shares.

54.     The OEMs have significant power over the price of truck components.

55.     Each of the remaining OEM's gained additional market power as the number of OEMs decreased.  Eaton was aware of the significance of the fact as evidenced by an internal Eaton presentation, which stated, in part: "OEM's will grow business as they control more of the total transaction costs . . . .  As production requirements grow, OEM's gain leverage."

### ZF MERITOR

56.     In the late-1990s, MERITOR grew at a sufficient pace that, left unchecked, would have eroded Eaton's dominant position.

57.     MERITOR (through its predecessor, Rockwell International Corporation), which first began to manufacture and sell Class 8 Linehaul Truck Transmissions in 1989 was, by 1992, able to gain roughly 14 percent of sales in the Class 8 Linehaul Transmissions submarket.  MERITOR had achieved additional growth after it obtained "standard" position on certain Freightliner truck models and availability in databooks at all the OEMs.

58.     In 1996, MERITOR developed an engine synchronized shift ("ESS") system, which automatically synchronized engine revolutions to road speed.  The innovation made

16

manual shifting easier, essentially eliminating the need to use the clutch pedal except for stopping and starting. In the same period, Eaton offered some transmission automation through its Top-2 and AutoSelect products. The Eaton and MERITOR technologies represented the first generation of Class 8 Truck Transmission automation in North America. MERITOR's introduction of ESS benefited consumers by, among other things, bringing competition to these automated products.

59.    By 1999, MERITOR's share of transmission sales for Class 8 Linehaul Transmissions had surpassed 20 percent. In an attempt to further enhance its position in the market, MERITOR entered into a joint venture with ZF Friedrichshafen AG to form ZF Meritor, in June 1999. ZF Friedrichshafen AG brought to the venture its expertise in transmission technology. The combination of ZF Friedrichshafen AG and MERITOR's marketing and service teams, distribution and manufacturing capabilities, and North American presence created a formidable competitor to Eaton.

60.    In August 1999, building upon MERITOR's existing relationship with Freightliner, ZF Meritor entered into a non-exclusive, short-term supply agreement with Freightliner, the largest Class 8 truck OEM in the United States. At Freightliner, ZF Meritor secured "standard" position on, among other models, Freightliner's popular Class 8 Century and Sterling's "Aeromax" truck models. The agreement did not require Freightliner to remove Eaton transmissions from the Freightliner databooks or charge customers a price penalty for selecting optional Eaton transmissions. The agreement was to run through 2001 and could be extended by the parties. ZF Meritor expected to achieve a high volume of transmission sales on Freightliner trucks.

61.    ZF Meritor transmissions were listed in the databooks as a competitively

priced option at the other OEMs.

62.     In November 1999, ZF Meritor further advanced its competitive position by introducing North America's first two-pedal, fully automated manual Class 8 Truck Transmission, called "FreedomLine."  Based on ZF's "Astronic" automated manual transmission, the FreedomLine beat Eaton's two-pedal offering (the UltraShift) to market by nearly three years.

63.     The FreedomLine represented the third generation in automated transmission technology for Class 8 trucks in North America.  First-generation and second-generation technology required the use of a foot-operated, clutch pedal, thereby necessitating a three-pedal configuration.  The FreedomLine did not require a clutch pedal; it operated with only accelerator and brake pedals.

64.     The superior efficiencies and value of the third-generation technology were numerous, ranging from improved fuel economy to enhanced driver safety, instruction, and retention, to less drive train wear, a quieter ride, and higher resale values.

65.     ZF Meritor's release of the FreedomLine put Eaton's dominant market position at risk.  Eaton did not have a two-pedal offering, and predictions in the heavy duty truck industry were that automated manual transmissions, including third-generation technology, would gain significant share among Class 8 Truck Transmission users.  Automated manual transmissions did, in fact, gain significant market share.  By 2005, the market share had reached 12 to 15 percent, with Eaton predicting additional growth of 1 to 2 percent each year.

66.     The emergence of ZF Meritor, with its "standard" positioning at Freightliner, its optional, competitively priced position at the other OEMs, its existing customer base

upon which to build, and its introduction of the FreedomLine transmission (particularly in the absence of a two-pedal Eaton transmission) created a substantial competitive threat to Eaton's market dominance.

## EATON CONSPIRES WITH THE OEMs TO MAINTAIN AND EXPAND EATON'S MONOPOLY POWER

67.     In 2000, the OEMs faced shrinking profits due to what has been described as a "collapse" of the heavy duty trucking industry characterized by markedly slow truck sales. Faced with increasing competitive pressure in the market for Class 8 Truck Transmissions, Eaton along with the OEMs began to look for any possible means to improve their financial outlook.  Defendants created a scheme whereby each of the OEMs would enter into a *de facto* exclusive dealing agreement with Eaton, which would provide upwards of 90+ percent of the OEM's Class 8 transmission needs.  In exchange, the OEMs would list Eaton's transmissions as "standard" in their databooks.  In order to maintain Eaton's 90+ percent market share, each OEM would either remove comparable ZF Meritor transmissions from the databooks or offer the ZF Meritor transmissions as high-cost options despite the fact that the ZF Meritor transmissions were often substantially less expensive.  In return, Eaton would provide the OEMs with hefty "rebates" once market share targets were met by each OEM.  Of course, these "rebates" were nothing more than the OEMs' share of monopoly rents derived from Class 8 truck consumers, such as Plaintiffs, whom were paying supra-competitive prices for Eaton transmissions through Class 8 truck purchases.

68.     As early as June 21, 2000, Eaton recognized that due to "[c]onsolidation, globalization & profit pressure" there was increased "[p]ressure on vertically integrated OEMs" which allowed "new partnerships to emerge."  Indeed, Eaton also recognized that its "[p]osition [was] at Risk" because ZF Meritor had become "a [s]erious [c]ompetitor."

69.     The OEMs approached Eaton with an idea to foreclose its competitors, specifically ZF Meritor, from the Class 8 Truck Transmissions Market.  According to Ken Davis, the President of Eaton's Americas Vehicle Group, Freightliner approached Eaton and "their proposal to us was that they wanted to reduce the number of suppliers."  According to Eaton's John Buck, the OEMs "were executing the strategy that they were going to have long-term supply agreements with their big suppliers and we [Eaton] either played or we lost."  This sentiment was echoed by Eaton's James Sweetnam who testified that the OEMs "had approached [Eaton]" regarding the long-term exclusive dealing agreements ("LTAs").

70.     An internal power point presentation titled "LTA Update," dated October 16, 2000, described Defendants' strategy as more than a series of "Contracts," and instead sought to build "Partnerships."  According to this presentation, "[a] Partnership is defined as a business relationship wherein both parties agree to assist one another in growing their business more profitably."  The presentation went on to explain how the "Partnership" would function:  "We agree to establish a working team, which will be charged with developing and growing the business opportunities for both companies."  The power point further discussed LTAs generally, stating that they provide a "Competitive Advantage in the Market" through "Databook Position."

71.     Defendants' strategy was facilitated by the LTAs, *de facto* exclusive contracts between and among Eaton and the OEMs, which expanded or extended prior supply agreements with provisions designed to deliberately foreclose competition.  The OEMs knew that if they agreed to make Eaton their exclusive supplier, there would be no room in the Class 8 Linehaul and Vocational Transmission market, in the United States, for any significant competitors.

72.     The LTAs contained lucrative bundled rebate and share penetration payments that the OEMs could achieve by diverting purchasers of transmissions to Eaton transmissions, and which therefore afforded a mechanism by which Eaton could share monopoly rents with its OEM co-conspirators.  By the LTAs, the OEMs agreed to exclude transmissions manufactured by Eaton's competitors or to penalize customers with higher prices or other punitive measures if those customers selected competitors' transmissions over Eaton transmissions.  Eaton and the OEMs agreed that the OEMs would refuse to offer competing transmissions, or dissuade customers from purchasing them, despite customer demand.  Ultimately, the agreements between and among Eaton and the OEMs to foreclose competition in the market for Class 8 Truck Transmissions in the United States was highly effective.  Indeed, Defendants' anticompetitive, illegal conspiracy described herein caused the only viable competitor at the time, ZF Meritor, to be foreclosed from 90 percent of sales in the Class 8 Linehaul Transmissions submarket and from 100 percent of sales in the Class 8 Vocational Transmissions submarket.

73.     The OEMs shared in the illicit monopoly rents that they and Eaton consequently extracted from the indirect purchaser Class, including, without limitation, through payments in the form of bundled loyalty "rebates."  The "rebates" were highly lucrative to the OEMs, which received millions of dollars in these shared monopoly rents.  Meanwhile, Plaintiffs and the other members of the Class paid substantial overcharges in the form of supra-competitive prices for Class 8 Truck Transmissions, through their purchases of Class 8 trucks, resulting from the diminution in competition caused by the LTAs and Defendants' other exclusionary conduct alleged herein.

74.     In addition to the large rebate provisions contained in the agreements with all

the OEMs, two OEMs, Freightliner and PACCAR, were able to negotiate clauses in their LTAs that ensured Eaton would not give other OEMs more favorable pricing.

75.     Once ZF Meritor learned about the conspiracy among Eaton and the OEMs, it approached the OEMs with competitive offers for Class 8 Truck Transmissions.  The OEMs responded that they could not negotiate with ZF Meritor because of their restrictive agreements with Eaton.  According to Dennis Kline, Vice President of Global sales at ZF Meritor, "I went to each and every one of them [the OEMs].  I tried to understand.  My understanding was almost to a man, it was a very, worrisome-type of situation.  And what they were explaining to me, and we came to learn, was there were very, very restrictive agreements in place."  He continued, "[m]y understanding was that customer by customer, they had accepted deals that were going to exclude us from the marketplace that had very, very rich payoffs if they did that. . . .  Each and every one of those OEMs, my understanding was that they struck new deals and that those deals were going to put us in a situation where we could not attain market share.  And our competitor, again, as I described yesterday, in a word that nobody liked, was, our competitor was going to wind up, again, with a monopoly."

76.     The OEMs uniformly refused to even consider lower-cost counter-proposals from ZF Meritor.  For example, according to Kline's testimony, ZF Meritor made multiple price discount offers to Volvo/Mack during numerous meetings, all of which were completely ignored.

77.     The agreements between and among Eaton and Freightliner, Volvo/Mack, PACCAR, and International, or alternately the single, overarching agreement among Eaton and the OEMs, ensured that Eaton maintained more than 90 percent share in the Market for

Class 8 Truck Transmissions, virtually guaranteeing that no competitor to Eaton would ever be able to gain sufficient market share to support entry into, or expansion of, sales in the Class 8 Truck Transmissions Market.

78.     As a direct and proximate result of the conspiracy or conspiracies complained of herein, Eaton's only competitor, ZF Meritor, lost a substantial share in the Market for Class 8 Truck Transmissions, curtailed much of its operations, and subsequently filed a lawsuit against Eaton.  In that lawsuit, the jury found Eaton's exclusivity agreements with the OEMs constituted a contract, combination, or conspiracy that unreasonably restrained trade.  *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation,* Civil Action No. 06-623-SLR (D. Del.).

### Eaton and Freightliner

79.     Following the downturn in the market for Class 8 trucks, Freightliner approached Eaton regarding an exclusive arrangement.  In fact, Freightliner was integral in implementing the conspiracy.  According to Eaton's James Sweetnam, Freightliner "looked at their own supply base, I think they made a decision that they want to try and single source, or put most of it into one supplier and see how best they can do."

80.     The agreement was mutually desired.  According to internal documents from Eaton, Eaton and Freightliner's agreement to maintain and expand Eaton's monopoly power "Resulted from desire of *both companies* to form [a] cohesive partnership."

81.     Eaton and Freightliner consummated their agreement, effective November 1, 2000.  The purpose and effect of the Eaton/Freightliner contract was to ensure that Eaton secured all, or virtually all, of Freightliner's transmission business, to the exclusion of any meaningful competition.  The effective exclusion of competition was accomplished by

providing Freightliner with substantial penetration incentives and bundled rebates, in exchange for Freightliner's agreement to purchase virtually all of their Class 8 Truck Transmission needs from Eaton and commit other exclusionary acts, including placing Eaton in standard position in Freightliner's databooks and displacing ZF Meritor (and other competitors) from that position.  Further, to assure that ZF Meritor (and other competitors) would starve in the market, in July 2003, Eaton and Freightliner amended their 2000 LTA for the third time.  The amendment extended the LTA through 2010 and added a sliding scale rebate formula that did not allow for rebates if Eaton's share of sales to Freightliner fell below a specified level.

82.    Freightliner promised to purchase at least 92 percent of its Class 8 Truck Transmission needs from Eaton in exchange for millions of dollars in shared monopoly rents, as well as additional incentives, from Eaton.  Freightliner and Eaton characterized these payments as "rebates."  Freightliner entered into this agreement despite the fact that it had previously awarded ZF Meritor standard positioning in its databooks.

83.    Eaton and Freightliner designed their conspiracy to ensure mutual compliance. Freightliner's right to a share in the monopoly rents was formalized as rebates and Eaton was legally obligated to pay under the contract so long as Freightliner met the agreed upon penetration goals.  Likewise, because Eaton was Freightliner's sole supplier of Vocational Transmissions, Eaton felt secure that Freightliner would not abandon the conspiracy.  The agreement included sizable rebates on Eaton's Vocational Transmissions, but linked those rebates to Freightliner's purchase of Linehaul Transmissions from Eaton.

84.    Eaton and Freightliner agreed that Freightliner would replace ZF Meritor with Eaton as the "standard" position in Freightliner's databooks.  Further, Eaton and

Freightliner agreed that ZF Meritor's transmissions would initially be listed at a penalty in the Freightliner databooks (*i.e.*, at prices above comparable Eaton transmissions) and would be excluded from the databooks altogether beginning in late-2001 or early-2002. Freightliner understood that excluding ZF Meritor from its databooks would serve as a powerful means of eliminating the only threat to Eaton's monopoly in the Class 8 Truck Transmissions Market.  Moreover, by eliminating Eaton's competition from its databooks, Freightliner made it highly unlikely that its Class 8 truck buyers would select Class 8 Truck Transmissions from any manufacturer other that Eaton.

85.    ZF Meritor attempted to save its Freightliner business by offering discounts and other incentives on its Linehaul Transmissions.  Freightliner regarded ZF Meritor's products to be of high quality.  Indeed, in 2000 and 2002, Freightliner awarded ZF Meritor its Master of Quality Award.  Freightliner did not award Eaton similar accolades. Nevertheless, despite the award and proposed discounts, ZF Meritor could not persuade Freightliner to offer its transmissions.

86.    Dennis Kline, Vice President of Global Sales at ZF Meritor, met with Freightliner executives, including Jim Thomas, Ted Southworth, and Greg Sharp, in 2000, to discuss keeping ZF Meritor listed in Freightliner's databooks.  Thomas informed Kline that Freightliner intended to "go with Eaton," and that Meritor should not fight the decision and compete for their business.  According to Kline, Thomas "explained . . . that the magnitude of the money was very significant and specifically an amount of money that they were looking at was in excess of $100 million."

87.    Freightliner further and intentionally facilitated the scheme to maintain and enhance Eaton's monopoly in several other ways.  For example, Eaton assisted Freightliner

by identifying truck fleets that could be converted to Eaton transmissions.  Additionally, Freightliner informed Eaton that it had stopped all engineering activity on the FreedomLine and other Meritor products.  If these methods did not work to dissuade specific customers from ZF Meritor's offerings, Freightliner priced ZF Meritor transmissions $200 above comparable Eaton products.

88.     This anticompetitive conduct had the purpose and effect of precluding ZF Meritor from competing effectively in the Class 8 Truck Transmissions Market.  According to Kline, Freightliner admitted at this meeting that "Eaton's strategy was to kill Meritor ZF's (sic) transmission business."

89.     Freightliner shared Eaton's strategy.  According to an e-mail from Greg Sharp at Freightliner, "[w]e have already killed Meritor's transmissions business.  It is only a matter of time before they close the doors."

90.     Freightliner regularly corresponded with Eaton to reaffirm its commitment to the conspiracy.  For example, on December 19, 2003, Greg Sharp, at Freightliner, e-mailed Matthew Sturdy, a sales manager at Eaton, to confirm that "[a]s you have requested we will remove the FreedomLine transmission from all data books effective with the next release, which is scheduled today for January 27th."

91.     Freightliner's agreement with Eaton harmed competition and injured consumers in the United States.  Among other things, removal of ZF Meritor transmissions from the Freightliner databooks and the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products.  Freightliner benefited from the impaired consumer access, as Eaton allowed Freightliner to share in the monopoly rents that it was able to extract from Plaintiffs and the other members of the Class.

92.     Eaton and Freightliner's conspiracy worked.  The conspiracy reduced competition in the market for Class 8 Truck Transmissions, eliminating Eaton's only viable competitor for Freightliner's transmission needs, ZF Meritor, and expanding Eaton's monopoly in the market.  As a direct and proximate result of the Eaton/Freightliner anticompetitive agreement and Defendants' other exclusionary acts, ZF Meritor's sales to Freightliner (and its subsidiaries, Sterling and Western Star) declined substantially.  Shortly before consummation of the Eaton/Freightliner contract, for the fourth quarter of fiscal year 2000, ZF Meritor's penetration at Freightliner and Sterling stood at around 23 percent and 17 percent, respectively.  By the end of fiscal year 2005, ZF Meritor's share of transmission sales to Freightliner and Sterling had fallen to roughly 4 percent and 3 percent, respectively.

### Eaton and International

93.     Eaton and International entered into a long-term *de facto* exclusive contract, or LTA, effective July 1, 2001.

94.     Internal Executive Summaries from Eaton recognize that this agreement was entirely mutual in nature as both parties shared the common goal of eradicating competition, including ZF Meritor, from the marketplace.  According to internal documents dated December 17, 2001, "International and Eaton have jointly developed a strategy to combat the Meritor strategy."

95.     Under the contract, International would receive maximum incentives after Eaton's transmissions sales penetration at International reached 87 percent, and possibly as high as 95 percent, by 2005, the last year of the agreement.  International also agreed to exclude ZF Meritor from its databooks on new truck models, and to prohibit International's

Diamond Spec warranty from covering new truck models equipped with ZF Meritor, rather than Eaton, transmissions.

96.     International took other steps to ensure Eaton maintained its monopoly position, as well.  For example, according to an e-mail from Steve McKeeby, Sales Manager at International Truck and Engine, International "[a]rtificially penalized Meritor transmissions in the databook as of April 2003."

97.     The Eaton/International "partnership" was so close that on February 8, 2005, the two companies held an "Eaton/International celebration Dinner" at Magnum's Steakhouse in Lombard, Illinois.  On the agenda for this dinner was discussion of the soon-to-expire LTA between the two companies.  A key aspect of the discussions involved trying "to understand some out of the box ideas that might benefit all of us for the future."

98.     In 2005, the original Eaton/International LTA expired, but during the negotiation of a new LTA, Eaton and International agreed to continue their relationship under the general guidelines of the previous agreement.  In February 2007, after an extended negotiation, Eaton and International entered into a new LTA.  In the new agreement, International agreed to remove the FreedomLine from its databooks and exclusively market Eaton's automated manual transmissions.

99.     International's agreement with Eaton harmed competition and injured consumers in the United States.  Among other things, removal of ZF Meritor transmissions from the International databooks, and the imposition of price penalties on ZF Meritor transmissions, impaired consumer access to those products.  International benefited from the impaired consumer access, as Eaton allowed International to share in the monopoly rents that it was able to extract from Plaintiffs and the other members of the Class.

100.   Eaton and International's conspiracy worked.   The conspiracy reduced competition in the market for Class 8 Truck Transmissions, eliminating Eaton's only viable competitor for International's transmission needs, ZF Meritor, and expanding Eaton's monopoly in the market.   As a direct and foreseeable result of the Eaton/International anticompetitive agreement, ZF Meritor's penetration at International declined.   Around the consummation of the Eaton/International contract, for the fourth quarter of fiscal year 2000, ZF Meritor's penetration at International was about 13 percent.   By the end of fiscal year 2005, Meritor's share of transmission sales to International had fallen to 2 percent.   As a result, for new International truck models, ZF Meritor transmissions would not be engineered into the vehicle platform; the transmissions simply would not be available on those vehicles, even as an unpublished option.

**Eaton and PACCAR**

101.   While ZF Meritor had enjoyed some success in selling to PACCAR because of a pre-existing supply relationship, Eaton and PACCAR modified and extended Eaton's supply agreement with PACCAR to prevent ZF Meritor's growth at PACCAR.   The July 1, 2000 LTA between Eaton and PACCAR, a seven-year agreement, offered maximum transmission rebates to PACCAR if Eaton's share of sales of Linehaul and Vocational transmissions (and other components) to PACCAR reached 95 percent.   Since PACCAR would be the first OEM (through Peterbilt) to release ZF Meritor's FreedomLine to customers, PACCAR's agreement with Eaton had a particularly negative effect on competition.

102.   PACCAR understood that the agreement was anticompetitive.   According to an e-mail dated September 20, 2002, from Thomas A. Lundahl, Vice President of Purchasing at

PACCAR, to Eaton's James Sweetnam, the 95 percent penetration agreement meant that PACCAR agreed to forego better-quality transmissions which created a "non-competitive situation."

103.   PACCAR imposed price penalties on ZF Meritor transmissions to encourage truck buyers to choose Eaton transmissions and, in 2005, PACCAR's Peterbilt division announced that ZF Meritor transmissions would no longer be available on new truck orders.

104.   In return for sharing monopoly rents with PACCAR, Eaton agreed to pay PACCAR a one-time lump sum signing incentive of $1 million.

105.   When PACCAR feared not meeting the agreed-upon penetration target due to customer preference for ZF Meritor's competing FreedomLine product, John Buck Jr., at Eaton, offered to set up a fund with all the missed rebate money that could be used to facilitate marketing efforts to increase PACCAR's sales of Eaton transmissions.

106.   In June 2007, with the Eaton/PACCAR LTA nearing expiration, Eaton and PACCAR agreed that their current business relationship, as established by the LTA, would continue after the expiration date on the same terms and conditions.

107.   PACCAR's agreement with Eaton, and its other anticompetitive acts as alleged herein, harmed competition and injured consumers in the United States.  Among other things, removal of ZF Meritor transmissions from PACCAR's databooks and the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products. PACCAR benefited from the impaired consumer access, as Eaton allowed PACCAR to share in the monopoly rents that it was able to extract from Plaintiffs and the other members of the Class.

108.   Eaton and PACCAR's conspiracy worked.  The conspiracy reduced competition in the market for Class 8 Transmissions, eliminating Eaton's only viable competitor for PACCAR's transmission needs, ZF Meritor, and expanding Eaton's monopoly in the market.  As a direct and foreseeable result of the Eaton/PACCAR anticompetitive agreement, ZF Meritor's share of transmission sales at PACCAR consistently languished around 5 percent and fell to less than 1 percent in fiscal year 2005.

**Eaton and Volvo/Mack**

109.   In the Spring and Summer of 2002, ZF Meritor attempted to form a commercial partnership with Volvo/Mack for the manufacture, marketing, and sale of Linehaul and Vocational Transmissions.  Such a partnership was a ZF Meritor priority, given the illicit agreements between Eaton and the other OEMs.  ZF Meritor offered substantial price reductions, year-over-year cost-downs (*i.e.*, price decreases), and the opportunity for Volvo/Mack to obtain a full line of private brand transmissions, including Vocational Transmissions.

110.   ZF Meritor's attempts to recruit Volvo/Mack's business, however, were in vain. According to an e-mail on November 27, 2000, from Christopher Konkel at Eaton, Volvo/Mack made it clear that it intended to join Eaton and the other OEMs in their anticompetitive conspiracy, stating that: "Volvo has delayed any action on the Freedom line (sic) in support of Eaton."

111.   Volvo/Mack's conduct was formalized in a long-term, five-year contract between Eaton and Volvo/Mack on October 1, 2002, despite Meritor's attempts to enter into an agreement with Volvo/Mack.  The agreement contained Linehaul and Vocational

Transmission penetration incentives that granted maximum rebates to Volvo/Mack if Volvo/Mack limited ZF Meritor's sales to 15 percent of Volvo/Mack's Linehaul and Vocational Transmission purchases.  Eaton and Volvo/Mack further diminished ZF Meritor's opportunity for sales at Volvo/Mack by agreeing that Volvo/Mack would price ZF Meritor transmissions at a penalty to Eaton transmissions.

112.   Eaton and Volvo/Mack held a Steering Committee meeting in September 2003 to review the success of their LTA.  Attendees at the review meeting included Antonio Lopes and Louya David from Volvo/Mack, as well as Tom Grimm, an Eaton Sales Manager for Volvo/Mack.  According to the presentation from this meeting, all participants felt that the LTA had been successful.  Since instituting the agreement, Volvo/Mack had increased their percentage of Eaton transmission purchases to 75 percent.

113.   In late-2007, Eaton and Volvo/Mack agreed to a new LTA.  Like the 2002 LTA, the new agreement contained benefits triggered by limiting the share of sales that Eaton's competitors attained at Volvo/Mack.

114.   Unlike other OEMs, Volvo/Mack actually manufactures its own line of Class 8 Truck Transmissions solely for their own product lines.  In order to ensure that Eaton continued to monopolize this market and thereby ensure its continued receipt of the lucrative rebates and market share incentives from Eaton pursuant to the LTA — Volvo/Mack agreed to price its own transmissions at a premium to Eaton.  Volvo/Mack transmissions, as a result of their agreement, actually lost market share to Eaton's transmissions.  Such conduct was in Volvo/Mack's economic interests only because of Volvo/Mack's agreement to promote and share in the financial benefits of Eaton's monopoly.

115.   Volvo/Mack acknowledged that its agreements with Eaton had harmed competition.  According to an e-mail from Linsolas Bruno, at Volvo, to Khalifa Sandrine, Louya David, and Callens Dominique (also Volvo employees), Eaton's LTA with Volvo/Mack "has been very well respected and very successfull (sic) for Eaton.  We just killed Arvin Meritor (sic) transmission business with this contract.  ArM (sic) sued Eaton, for unfair practises (sic), having such market share clauses in their contracts with all OEMs. Eaton succeeded to eliminate their only and last competitor in the [market].  This is just an unvaluable (sic) upside for Eaton (be now in a monopolistic situation.!)."

116.   The agreement between Eaton and Volvo/Mack harmed competition and injured consumers in the United States.  Among other things, the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products. Volvo/Mack benefited from the impaired consumer access, as Eaton allowed Volvo/Mack to share in the monopoly rents that it was able to extract from Plaintiffs and the other members of the Class.

117.   Eaton and Volvo/Mack's conspiracy worked.  The conspiracy reduced competition in the market for Class 8 Truck Transmissions, eliminating Eaton's only viable competitor for Volvo/Mack's transmission needs, ZF Meritor, and expanding Eaton's monopoly in the market.  As a direct and foreseeable result of the anticompetitive agreement between Eaton and Volvo/Mack, ZF Meritor's penetration at Volvo/Mack declined.  ZF Meritor's share of transmission sales to Volvo and Mack fell from an estimated 24 percent and 6 percent, respectively, in the fourth quarter of fiscal year 2002, around the time of the EatonVolvo/Mack transaction, to approximately 11 percent and 2 percent, respectively, by the end of fiscal year 2003.

## ANTITCOMPETITIVE EFFECTS OF THE CONSPIRACY

118.    The conspiracy or conspiracies between and among Eaton and the OEMs were designed so that the OEMs would qualify for rebates, and thus share in the monopoly rents, provided they diverted both current and future purchasers of competing transmissions to Eaton.  Defendants employed a variety of strategies to accomplish this goal including agreeing to have the OEMs:

(a)    eliminate competing transmissions from databook listings;

(b)    reduce the residual values to be paid for trucks sold with competing transmissions;

(c)    impose artificial pricing penalties upon heavy duty truck purchasers that selected non-Eaton Class 8 Truck Transmissions;

(d)    exclude trucks containing non-Eaton Class 8 Truck Transmissions from warranty programs;

(e)    notify customers that competing transmissions were not available, even though they were available; or

(f)    delay and disrupt the release and sale of competing transmissions.

119.    The contracts, combinations, or conspiracies between and among Eaton and the OEMs materially increased the already artificially inflated prices of Eaton transmissions, to the detriment of Plaintiffs and the other members of the Class.

120.    Defendants' anticompetitive conduct — including LTAs between Eaton and the OEMs, employment of bundled rebates, lucrative share penetration incentives, databook and other exclusions, and punitive pricing on competing transmissions — had the practical

effect of precluding competitors from selling Class 8 Linehaul and Vocational Truck Transmissions to the OEMs.

121.   With its potential share of sales of Class 8 Linehaul and Vocational Truck Transmissions to the OEMs limited to less than 10 percent, and no practical ability to increase its sales because of Defendants' exclusionary conduct, the ZF Meritor joint venture was dissolved.

122.   MERITOR nonetheless tried to remain a supplier of Class 8 Truck Transmissions to the OEMs, and became a sales agent for ZF Friedrichshafen AG to ensure continued customer access to the FreedomLine.  Defendants' continued anticompetitive conduct, however, led to still further declines in MERITOR's sales.  By the end of fiscal year 2005, MERITOR's sales of transmissions at the four OEMs, including sales of the FreedomLine, had tumbled further.  MERITOR, other than marketing the FreedomLine, exited the manual transmission business in 2007.  Although MERITOR once held a share of roughly 22 percent of the relevant market, that share dwindled to around 4 percent in 2006. MERITOR now markets only a small number of automated manuals and, since 2007, no longer markets any non-automated manual transmissions.

123.   The foregoing anticompetitive conduct by Eaton and the OEMs has directly and proximately harmed competition by limiting consumer choice, eliminating competitive checks on pricing, suppressing innovation, and foreclosing the market for Class 8 Truck Transmissions in the United States.  Defendants' acts have served to exclude competition from the market for Linehaul Transmissions, and ZF Meritor has been deterred from undertaking investments in technology and products that would have threatened Eaton's monopoly in the market for Vocational Transmissions.

124.   The foregoing anticompetitive conduct by Defendants has caused antitrust injury to Plaintiffs and the other members of the Class by foreclosing competition for Class 8 Truck Transmissions and artificially inflating the prices of such transmissions.

125.   In contrast to the harm Defendants' conduct has caused Plaintiffs and the other members of the Class, Eaton's business, which relies heavily on transmission sales, has amassed record profits.  Since the start of Defendants' anticompetitive conduct, Eaton's operating profits from its sales of Class 8 Truck Transmissions have increased from $90 million in 2002, to a high of $453 million in 2005, and $315 million in 2008.  At the same time, Eaton's operating margins have increased from 7.7 percent in 2002, to a high of 19.8 percent in 2005, and 14 percent in 2008.

126.   The foregoing anticompetitive conduct by Defendants, and the resultant injuries, occurred throughout the Class Period, and continues to date, as Eaton and the OEMs still operate under existing or renewed *de facto* exclusive dealing contracts, and continue to engage in other conspiratorial behavior in furtherance of the conspiracy or conspiracies to foreclose competition in the Market for Class 8 Truck Transmissions.

## INJURY TO PLAINTIFFS AND THE OTHER MEMBERS OF EACH CLASS

127.   The activities described above have been engaged in by Defendants for the purpose of effecting an unlawful agreement to fix, raise, maintain, or stabilize prices for Class 8 Truck Transmissions sold in the United States.

128.   At all relevant times, Eaton had monopoly or market power in the market for Class 8 Truck Transmissions because it had the power to maintain the price of such transmissions at supra-competitive levels profitably, without losing substantial sales.

129.   In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of Class 8 Truck Transmissions to other products would not be significant.

130.   Class 8 Truck Transmissions do not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than Class 8 Truck Transmissions.

131.   Because of the unique characteristics and specific applications for Class 8 Truck Transmissions, Class 8 Truck Transmissions are differentiated from all other products.

132.   Defendants need only control Class 8 Truck Transmissions, and no other products, to raise or maintain the price of Class 8 Truck Transmissions profitably at supra-competitive levels.

133.   Defendants sold Class 8 Truck Transmissions at prices well in excess of marginal costs and competitive prices and enjoyed healthy profit margins.

134.   Defendants had, and exercised, the power to exclude competition for Class 8 Truck Transmissions.

135.   As a direct and proximate result of the contract, combination, and conspiracy alleged herein, and the monopoly power of Eaton maintained and enhanced by Defendants, Plaintiffs and other members of the Class are, were, and continue to be damaged in their business or property in that they paid supra-competitive prices for Class 8 Truck Transmissions during the Class Period.

**THE PASS THROUGH OF OVERCHARGES TO CLASS 8 TRUCK PURCHASERS**

136.   Defendants' conspiracy to fix, raise, or maintain the price of Class 8 Truck Transmissions at artificial levels resulted in harm to Plaintiffs and the other members of the Class because it resulted in them paying higher prices for Class 8 Truck Transmissions than they would have in the absence of Defendants' conspiracy.

137.   Class 8 truck buyers, like Plaintiffs, select a particular Class 8 Truck Transmission for the Class 8 truck purchased.  Moreover, when a Class 8 Truck Transmission is purchased for inclusion in the buyer's Class 8 truck, the transmission is a distinct, physically-discrete element of the Class 8 truck that is identifiable by a specific, discrete part or model number that permits tracing.  Thus, a Class 8 Truck Transmission follows a traceable physical chain from Defendants to the indirect purchasers of Class 8 Truck Transmissions.  Tracing can help show that changes in the prices paid by direct purchasers of Class 8 Truck Transmissions affect prices paid by indirect purchasers of the Class 8 Truck Transmissions, or, more broadly, Class 8 trucks.

138.   As a result, the inflated prices of Class 8 Truck Transmissions resulting from Defendants' conspiracy have been passed on to Plaintiffs and the other members of the Class.

139.   A Class 8 Truck Transmission makes up a substantial component of the cost of a Class 8 truck.  The retail price of a Class 8 truck is determined, in significant part, by the cost of the Class 8 Truck Transmission it contains.

140.   Microeconomic theory teaches that the only situations in which precisely zero pass through would be expected are if an industry faced a perfectly elastic demand for its product (*i.e.*, the price was fixed, with demand dropping to zero with an infinitesimal price increase, and expanding infinitely if price were to drop infinitesimally), or if supply was

perfectly inelastic (*i.e.*, if even a very large increase in price for a product was incapable of stimulating additional supply).  Both of these possibilities are generally considered implausible by economists, and are not even mentioned in some discussions of the subject.  Either scenario is at odds with the nature of the Class 8 truck industry.

141.   Thus, Plaintiffs and the other members of the Class have been forced to pay supra-competitive prices for Class 8 Truck Transmission and, more broadly, Class 8 trucks, as a result of Defendants' conspiracy.

## FRAUDULENT CONCEALMENT

142.   Plaintiffs and the other members of the Class did not discover, and could not have discovered through the exercise of reasonable due diligence, Defendants' anticompetitive and conspiratorial conduct alleged herein, or the existence of the causes of action alleged herein, at any time prior to October 5, 2006, when ZF Meritor filed an antitrust lawsuit against Eaton.  Even then, assuming Plaintiffs and the members of the Class would have been monitoring court filings in various federal courts and understood their implications, Eaton denied the claims asserted in the lawsuit by ZF Meritor, and Plaintiff's and other members of the Class did not have access to the same inside information that ZF Meritor had.

143.   Because Defendants did not disclose the existence or nature of their anticompetitive conduct to Plaintiffs and the other members of the Class, Plaintiffs and the other members of the Class could not have reasonably become aware of Defendants' unlawful conduct alleged herein at any time prior to October 5, 2006 or well after that, and certainly could not known that they were paying artificially high prices for Class 8 Truck Transmissions as a result of Defendants' conduct.

144.   Defendants' affirmative acts alleged herein, including acts in furtherance of the conspiracy or conspiracies, were wrongfully concealed and carried out in a manner that precluded detection.

145.   Defendants formally entered into the conspiracy or conspiracies by, among other things, signing and agreeing to the terms of the LTAs.   In addition to their exclusive dealing language, the LTAs also contained confidentiality language that effectively concealed the anticompetitive nature of Defendants' conduct from Plaintiffs and the other members of the Class.

146.   Defendants fraudulently concealed their participation in the conspiracy or conspiracies alleged herein by entering into *de facto* exclusive dealing contracts and then engaging in actions to ensure that the contracts succeeded in eliminating competition from the Class 8 Truck Transmissions Market.   These actions included, without limitation, ensuring that ZF Meritor transmissions did not appear in databooks and falsely informing customers that ZF Meritor transmissions were not available.   Defendants' actions were self-concealing in that they pushed customers away from competing transmissions but never disclosed to the customers that their actions were part of a conspiracy or conspiracies to eliminate competition from the Class 8 Transmissions Market.

147.   Because of such fraudulent concealment and the inherently self-concealing nature of the actions forming this conspiracy or conspiracies, Plaintiffs and the other members of the Class could not have discovered the existence of this conspiracy or conspiracies, and the elements of the causes of action alleged herein, until long after the filing of ZF Meritor's action against Eaton.

148.   Although Plaintiffs exercised all reasonable and due diligence, Plaintiffs had no knowledge of Defendants' unlawful self-concealing anticompetitive conduct, and could not have discovered Defendants' agreements and conspiracies, and the existence of the causes of action alleged herein, at any time prior to October 5, 2006, by the exercise of due diligence, because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, their agreements and conspiracies.

149.   None of the facts or information available to Plaintiffs and the other members of the Class prior to October 5, 2006, if investigated with reasonable due diligence, could or would have led to the discovery of the conspiracies and anticompetitive conduct alleged herein prior to October 5, 2006.

150.   As a result of Defendants' fraudulent concealment of their conspiracies, Plaintiffs assert the tolling of the applicable statute of limitations affecting Plaintiffs' right of action.

151.   In addition, Defendants' illegal conspiratorial conduct and the harm it caused, as alleged herein, occurred continuously throughout the Class Period, and continues to the present day, including the fact that Defendants continue to abide by the terms of the LTAs and ensure that competitors' transmissions do not appear in the OEM Defendants' databooks.

## COUNT I

## FOR VIOLATIONS OF STATE ANTITRUST LAWS

152.   Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

153.   Defendants' anticompetitive acts as described above are in violation of the following state antitrust statutes and laws:

154.   Defendants have violated Arizona Revised Stat. Code §§ 44-1401 *et seq.*

155.   Defendants have violated California Bus & Prof. Code §§ 16700 *et seq.*

156.   Defendants have violated District of Columbia Code Ann. §§ 28-4501 *et seq.*

157.   Defendants have violated Iowa Code §§ 553.1 *et seq.*

158.   Defendants have violated Kansas Stat. Ann. §§ 50-101 *et seq.*

159.   Defendants have violated Maine Rev. Stat. tit. 10 §§ 1101 *et seq.*

160.   Defendants have violated Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

161.   Defendants have violated Minnesota Stat. §§ 325D.50 *et seq.*

162.   Defendants have violated Nebraska Rev. Stat. §§ 59-801 *et seq.*

163.   Defendants have violated Nevada Rev. Stat. §§ 598A *et seq.*

164.   Defendants have violated New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

165.   Defendants have violated North Carolina Gen. Stat. §§ 75-1 *et seq.*

166.   Defendants have violated North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

168.   Defendants have violated South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

169.   Defendants have violated Tennessee Code Ann. §§ 47-25-101 *et seq.*

170.   Defendants have violated Vermont Stat. Ann. 9 §§ 2453 *et seq.*

171.   Defendants have violated West Virginia Code §§ 47-18-1 *et seq.*

172.   Defendants have violated Wisconsin Stat. §§ 133.01 *et seq.*

173.   Defendants' combination or conspiracies had the following effects: (1) Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout each of the states mentioned above, as well as nationwide; (2) Class 8 Truck Transmissions

prices were raised, fixed, maintained and stabilized a artificially high levels throughout each of

the states mentioned above, as well as nationwide; (3)  Plaintiffs and the other members of the

Class were deprived of free and open competition in each of the states mentioned above, as well

as nationwide; and (4) Plaintiffs and the other members of the Class paid supra-competitive,

artificially inflated prices for Class 8 Truck Transmissions in each of the states mentioned above,

as well as nationwide.

176. During the Class Period, Defendants' illegal conduct substantially affected

commerce in each of the states mentioned above, as well as nationwide.

175. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

the other members of the Class in each of the states mentioned above, as well as nationwide have

been injured in their business and property and are threatened with further injury.

176. By reason of the foregoing, Defendants have entered into agreements in restraint

of trade in violation of each of the states mentioned above, as well as nationwide.  As a result of

Defendants' and their co-conspirators' violation of the antitrust laws in the states listed above,

Plaintiffs and the Class seek damages (including full consideration damages in Kansas), to be

trebled where permitted by a particular State's antitrust law, and costs of suit, including

reasonable attorneys' fees, to the extent permitted by the above state antitrust laws.

## COUNT II

## FOR VIOLATION OF STATE CONSUMER PROTECTION AND
## UNFAIR COMPETITION LAWS

177. Plaintiff realleges and incorporates by reference each of the foregoing

paragraphs.

178. Defendants have engaged in unfair competition or unfair, unconscionable,

deceptive, or fraudulent acts or practices in violation of the following state consumer

protection and unfair competition statutes:

179.   Defendants have violated Arkansas Code §§ 4-88-101 *et seq.*

180.   Defendants have violated California Bus & Prof. Code §§ 17200 *et seq*.

181.   Defendants have violated District of Columbia Code Ann. § 28-3901 *et seq.*

182.   Defendants have violated Florida Stat. §§ 501.201 *et seq.*

183.   Defendants have violated Hawaii Rev. Stat. § 480-2.

184.   Defendants have violated Mass. Gen. Laws chapter 93A §§ 1 *et seq.*

185.   Defendants have violated Nebraska Rev. Stat. §§ 59-1601 *et seq.*

186.   Defendants have violated Nevada Rev. Stat. §§ 598.0903 *et seq.*

187.   Defendants have violated New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*

188.   Defendants have violated New Mexico Stat. Ann. §§ 57-12-1 *et seq.*

189.   Defendants have violated New York Gen. Bus. Law §§ 349 *et seq.* Specifically:

a.   Defendants engaged in commerce in New York;

b.   Defendants and their co-conspirators secretly agreed to raise prices to class members located in New York and restrained trade in the New York markets for Class 8 truck transmissions;

c.   New York consumers were targets of the conspiracy;

d.   The secret agreements were not known to New York consumers;

e.   Because of Defendants' unlawful trade practices in the State of New York, there was a broad impact on New York consumer class members who indirectly purchased Class 8 truck transmissions; and consumer class members have been injured because they have paid more for Class 8 truck transmissions than they would have

paid in the absence of Defendants' unlawful trade acts and practices;

g.      Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased Class 8 truck transmissions were misled to believe that they were paying a fair price for Class 8 truck transmissions;

h.      Defendants knew that their unlawful trade practices with respect to pricing of Class 8 truck transmissions would have an impact on New York consumers and not just Defendants' direct customers;

i.      Defendants knew that their unlawful trade practices with respect to pricing of Class 8 truck transmissions would have a broad impact, causing consumer class members who indirectly purchased Class 8 truck transmissions to be injured by paying more for Class 8 truck transmissions than they would have paid in the absence of Defendants' unlawful trade acts and practices; and

j.      Defendants' consumer-oriented violations adversely affected the public interest in the State of New York.

190.    Defendants have violated North Carolina Gen. Stat. §§ 75-1.1 *et seq.*

191.    Defendants have violated Vermont Stat. Ann. 9 §§ 2451 *et seq.*

192.    Defendants' intentional and purposeful anti-competitive acts described above, including, but not limited to, acts of collusion to set prices and the acts of price fixing, were intended to and did cause Plaintiffs to pay supra-competitive, artificially inflated prices for the Class 8 truck transmissions purchased in the states listed above.

193.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they paid more for Class

8 truck transmissions than they otherwise would have paid in the absence of Defendants' unlawful conduct.

194.    Plaintiffs and Class members are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including but not limited to, actual damages, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

## COUNT III

## FOR UNJUST ENRICHMENT

195.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs.

196.    Defendants have benefited from unlawful acts through the overpayments and increased profits for Class 8 Truck Transmissions paid by Plaintiffs and the other members of the Class.

197.    It would be inequitable for Defendants to retain the benefits resulting from these overpayments, which were conferred by Plaintiffs and the other members of the Class.

198.    Plaintiffs and the other members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiffs and the other members of the Class may make claims of a pro-rata basis for restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment:

(a)     Certifying that this action may be maintained as a class action under

Rule 23(b)(3) of the Federal Rules of Civil Procedure, appointing each Plaintiff as the representative of their respective Class, and appointing Plaintiffs' counsel as lead counsel for the Class;

(b)     Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the members of the Class;

(c)     Awarding Plaintiffs and the other members of the Class their full monetary damages to be proven at trial, trebled, plus attorneys' fees;

(d)     Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest on their damages at the maximum legal or equitable rate; and

(e)     Awarding Plaintiffs and the other members of the Class such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  October 4, 2010

Respectfully Submitted,

/s/ Rex A. Sharp
Rex A. Sharp #12350
Barbara C. Frankland #14198
Gunderson, Sharp & Walke, LLP
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0500
(913) 901-0419 fax
rsharp@midwest-law.com
bfrankland@midwest-law.com

Joseph R. Gunderson
Gunderson Sharp & Walke, LLP
321 E. Walnut Street, Suite 300
Des Moines, IA  50309
(515) 288-0219
(515) 288-0328 fax
jgunderson@midwest-law.com

Brian P. Murray
Lee Albert
Benjamin D. Bianco
Murray Frank & Sailer, LLP
275 Madison Avenue, Suite 801
New York, New York 10016
(212) 682-1818
(212) 682-1892 fax
bmurray@murrayfrank.com
lalbert@murrayfrank.com
bbianco@murrayfrank.com

*Counsel for Plaintiffs*